IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VINO 100, LLC, et al.            :       CIVIL ACTION
                                 :
        v.                       :
                                 :
SMOKE ON THE WATER, LLC, et al.  :       NO. 09-4983

MEMORANDUM

Bartle, J.                                            July 1, 2011

      Plaintiff Vino 100, LLC ("Vino 100") and The Tinder Box International, Ltd. ("Tinder Box") sued Smoke on the Water, LLC and Thomas and Jane Slaterbeck for breach of two franchise agreements and for trademark violations under the Lanham Act, 15 U.S.C. §§ 1114-17. Defendants answered and asserted a nine-count counterclaim against plaintiffs. Before the court are the separate motions of Vino 100 and Tinder Box to dismiss all nine counts of the counterclaim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the arguments presented in each motion are identical, we consider the motions together.

I.

      When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts as true all factual allegations in the pleading and draws all inferences in the light most favorable to the nonmoving party. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). We then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief

that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> Thus, the allegations must do more than raise a "'mere possibility of misconduct.'" <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) (quoting <u>Iqbal</u>, 129 S. Ct. at 1950). In deciding a motion to dismiss under Rule 12(b)(6), the court may consider "an undisputedly authentic" document upon which a party explicitly relies in pleading its claims, whether or not the document is attached to the challenged pleading. <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1425-26 (3d Cir. 1997) (quoting <u>In re Donald J. Trump Casinos Sec. Litig.</u>, 7 F.3d 357, 368 (3d Cir. 1993)).

## II.

The following facts are viewed in the light most favorable to the Slaterbecks,[1] the non-moving parties.[2]

Since 1961, Tinder Box has licensed franchises of retail stores that sell tobacco products and related goods. In

---

1. Throughout this memorandum, we refer to Thomas and Jane Slaterbeck and Smoke on the Water, LLC collectively as "the Slaterbecks."

2. The Slaterbecks are New Jersey residents, and Smoke on the Water is a New Jersey business entity with its principal place of business in New Jersey. Vino 100 is a Delaware entity, and Tinder Box is a California entity. Both Vino 100 and Tinder Box have their principal place of business in Pennsylvania.

July 2003, Vino 100 began franchising retail stores that purvey wine, as well as assorted cheeses and chocolates. Tinder Box and Vino 100 share at least one executive officer, and Vino 100 is described to the public as a "branch" of Tinder Box.

As prospective franchisees, the Slaterbecks received a Uniform Franchise Offering Circular ("UFOC") from Vino 100 published on March 17, 2004.[3] The UFOC acknowledged that Vino 100 did not have any company-owned stores and recognized that because Vino 100 had only been in existence a short time, potential franchisees may have difficulty determining whether to invest in a Vino 100 franchise. The UFOC estimated that a franchisee would be required to invest between $139,475 and $414,300 to make a Vino 100 store operational. Notwithstanding these caveats in the UFOC, the Slaterbecks allege that they were induced to purchase a Vino 100 franchise based on Vino 100's representations that it had developed a "'unique and distinctive system,'" which was both "a proven system" and "a viable concept."[4] Vino 100 agents told the Slaterbecks that its stores

---

3. Under Federal Trade Commission rules, companies offering franchises for sale must provide certain documents to prospective franchisees. See 16 C.F.R. § 436.2. The counterclaim does not discuss any UFOC that Tinder Box may have provided the Slaterbecks.

4. The Slaterbecks' counterclaim includes many statements about Vino 100 quoted from a "fact sheet" and what appears to be a magazine article about Vino 100 that allegedly appears on its website. The fact sheet is undated, and the article is dated September 2007. The counterclaim does not allege that the Slaterbecks relied on statements in either document in becoming
(continued...)

were "selling fast," "a great investment," and that the network of Vino 100 stores was "growing."[5]

The Slaterbecks allege that Vino 100 knew these statements to be false and misleading. Vino 100 purportedly was aware that its franchise business model was fatally flawed and that potential franchisees were unlikely to ever recover the amount of their initial investments.

In 2005, the Slaterbecks decided to purchase a joint Tinder Box/Vino 100 franchise store located inside a casino after visiting such a store in Atlantic City, New Jersey. In April 2005, the Slaterbecks paid a $30,000 fee to obtain a combined Tinder Box and Vino 100 franchise inside a casino. For reasons that are not stated, the Slaterbecks were unable to open a casino store, and Vino 100 and Tinder Box refused the Slaterbecks' requests to return the $30,000 franchise fee.

Vino 100 and Tinder Box persuaded the Slaterbecks to purchase instead a combined Tinder Box and Vino 100 franchise

---

4.(...continued)
franchisees. Given the timing of the other events described below, there is no basis to infer that the Slaterbecks relied on these documents before purchasing a Vino 100 franchise.

5. These representatives also stated that Vino 100 products could be sold at keystone pricing. Although the counterclaim does not define this term, we understand the term typically denotes a 100% markup on retail goods. See The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1150-51 (9th Cir. 1988); Garment Dist., Inc. v. Belk Stores Servs. Inc., 799 F.2d 905, 907 (4th Cir. 1986).

store in Atlanta, Georgia.[6] Vino 100 and/or Tinder Box owned this store and assured the Slaterbecks that the store "pays for itself" and "breaks even." Vino 100 representatives told the Slaterbecks that sale of Vino 100 proprietary wines would increase the store's gross revenue by $400,000. The CEO of both Vino 100 and Tinder Box also assured the Slaterbecks that the store generated enough revenue to cover the rent it owed on the property it leased.

On June 15, 2005, the Slaterbecks signed two franchise agreements, one with Vino 100 and one with Tinder Box. On the same day, the Slaterbecks, Vino 100, and Tinder Box executed a 59-paragraph Addendum that modified the terms of both franchise agreements. The Slaterbecks paid Tinder Box $315,480.10 for the Atlanta store's assets and inventory and agreed to assume the store's lease. The monthly rent the Slaterbecks agreed to pay was more than three times what Vino 100 normally recommends new franchisees assume.

Subsequently, the Slaterbecks spent $238,342.89 renovating the Atlanta store. Vino 100 and/or Tinder Box required the Slaterbecks to use preferred vendors for items such as flooring, fixtures, packaging, cabinetry, computer systems, and computer software, and in return, some of these preferred

---

6. From the counterclaim, it is unclear whether the Atlanta store was already a joint Tinder Box/Vino 100 franchise store when the Slaterbecks purchased it or whether the Vino 100 retail element would be added to an existing Tinder Box franchise store after the Slaterbecks acquired it.

vendors purportedly paid "kickbacks" to Vino 100 and/or Tinder Box.  The cost of the renovations plus the cost of purchasing the store's assets exceeded $550,000, which is over $100,000 more than the highest estimated start-up cost for a Vino 100 franchise described in the UFOC.[7]

After opening the joint franchise store in Atlanta, the Slaterbecks claim they did not receive training, an operations manual, or promotional materials from Vino 100 or Tinder Box even though these items were promised in the franchise agreements.  In 2006, Tinder Box licensed a third party to operate www.tinderbox.com, an internet website that competed for sales with the Slaterbecks' store, but which did not charge its customers Georgia sales tax.  Once in business, the Slaterbecks learned that Vino 100 did not have any proprietary wines available for sale in Georgia.  The Slaterbecks also discovered that the majority of Vino 100 franchisees are "in financial distress."

Financial considerations forced the Slaterbecks to close their store in October 2009.  As a result of their investment in the Vino 100 and Tinder Box franchises, the Slaterbecks maintain they have lost over $615,000.

Tinder Box and Vino 100 sued the Slaterbecks for breaches of the franchise agreements that are not relevant for

---

7.  The Slaterbecks have not alleged the estimated start up costs for a Tinder Box franchise or a joint Tinder Box/Vino 100 franchise.

present purposes. The Slaterbecks filed a nine-count counterclaim that included causes of action under Pennsylvania and Georgia law. Following the motions of Vino 100 and Tinder Box to dismiss the counterclaim, the Slaterbecks voluntarily dismissed Counts VI and VIII of the counterclaim.

III.

Count I of the counterclaim alleges that Tinder Box and Vino 100 breached the franchise agreements, which provide that they shall be interpreted in accordance with Pennsylvania law. Under the law of the Commonwealth, "[a] cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999); see Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003).

Many of the purported breaches alleged in Count I cannot be said to be breaches of a contractually-imposed obligation. First, the Slaterbecks allege that Vino 100 and Tinder Box failed "to honor the UFOC terms providing for a ceiling on the initial investment." The franchise agreements and the Addendum state explicitly that they encompass the parties' entire agreement. Statements in the UFOC are thus parol evidence and do not define any party's obligations under the contracts. Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).

The Slaterbecks also allege that Vino 100 and Tinder Box failed "to provide proprietary 'private label' products, marketing strategies, site selection, store construction assistance, and inventory selection."  How Vino 100 or Tinder Box could have failed to assist with or provide "site selection" is difficult to understand since the location of the Atlanta store was known on the date the Slaterbecks signed the franchise agreements and Addendum.  Neither the franchise agreements nor the Addendum state that Vino 100 or Tinder Box is under an obligation to assist with store construction.  Finally, section IV(B)(3) of the Vino 100 franchise agreement explicitly says that, notwithstanding anything else in the contract, Vino 100 is under no obligation to help the Slaterbecks obtain inventory.  Thus, Vino 100 could not have breached the franchise agreement by not locating suppliers of proprietary, "artisanal" wines for the Slaterbecks.

The only portions of Count I that are grounded in obligations imposed by the contracts are the obligations of both Vino 100 and Tinder Box to provide the Slaterbecks with an operations manual, to conduct training prior to the opening of the Atlanta store, and to supply marketing materials.  The Slaterbecks allege they did not receive these items and that this caused them damage.

Vino 100 and Tinder Box argue that Count I is untimely under either a contractually-imposed one- or two-year statute of limitations or Pennsylvania's general four-year statue of

-8-

limitations on contract actions. See 42 Pa. Cons. Stat. § 5525. Generally, the statute of limitations runs from the date of the alleged breach. S.T. Hudson Eng'rs, Inc. v. Camden Hotel Dev. Assocs., 747 A.2d 931, 934 (Pa. Super. Ct. 2000). Under Pennsylvania law, parties may agree by contract to shorten the statute of limitations as long as the period specified is not "manifestly unreasonable." 42 Pa. Cons. Stat. § 5501(a).

The parties here agreed to shortened statute of limitations. The Vino 100 franchise agreement provides:

> [N]o cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of 2 years after the act, transaction or occurrence upon which such action is based; or the expiration of 1 year after such party becomes aware of facts or circumstances reasonably indicating that such party may have a claim against the other party hereunder, whichever period of time shall first expire, and that any action not so brought shall be barred, whether as a claim, counterclaim, defense or setoff.[8]

Whether the Slaterbecks were required to bring their breach of contract claims within one or two years depended on when the Slaterbecks learned of the facts indicating a breach had occurred. Despite the Slaterbecks' arguments to the contrary, Pennsylvania courts have routinely held that a one-year statute of limitations is not manifestly unreasonable. Lardas v. Underwriters Ins. Co., 231 A.2d 740, 741-42 (Pa. 1967); Smith v. Am. Equity Ins. Co., 235 F. Supp. 2d 410, 412 (E.D. Pa. 2002);

---

8. The Tinder Box franchise agreement contains a nearly-identical provision, except that the statute of limitations provision in that contract also applies to claims brought by Tinder Box against the Slaterbecks.

Caln Vill. Assocs., L.P. v. Home Indem. Co., 75 F. Supp. 2d 404, 410-11 (E.D. Pa. 1999).

It is unclear from the face of the counterclaim when Vino 100 and Tinder Box breached their contractual obligation to provide the Slaterbecks with an operations manual and marketing materials. In such situations, we will not dismiss an action on statute of limitations grounds. Robinson v. Johnson, 313 F.3d 128, 135 & n.3 (3d Cir. 2002).

Vino 100 and Tinder Box were also obligated under the franchise agreements to provide the Slaterbecks with training prior to the opening of the Atlanta store. The franchise agreements further required the Slaterbecks to bring any action for breach of contract against Vino 100 or Tinder Box within one year of those entities' failure to provide the training. From the counterclaim, it appears that the Atlanta store was operating by February 2006. The Slaterbecks did not bring their claim for failure to receive the promised training within one year thereafter as required by the contracts. Accordingly, that portion of Count I related to the failure of Vino 100 and Tinder Box to provide training is untimely.[9]

That portion of Count I that alleges a breach of contract for the failure of Vino 100 and Tinder Box to provide

---

9. The Slaterbecks' brief suggests that the Vino 100 portion of the Atlanta store opened sometime in the spring of 2007 and that Vino 100 and Tinder Box were obligated to provide training thereafter. This fact is not in the counterclaim and we may not consider it.

the Slaterbecks with an operations manual and marketing materials will proceed. The balance of Count I will be dismissed for failing to state a claim upon which relief can be granted.

IV.

Count II of the counterclaim alleges that Vino 100 and Tinder Box breached the implied covenant of good faith and fair dealing. Pennsylvania's implied covenant of good faith and fair dealing "simplifies arrangements between contracting parties by prohibiting one party from acting solely for his own benefit and to the detriment of the entire agreement. In many cases the parties could explicitly prohibit such opportunistic behavior, but doing so would be very time consuming and expensive." Bicycle Corp. of Am. v. Meridian Bank, Case No. 95-6438, 1995 WL 695090, at *4 (E.D. Pa. Nov. 21, 1995).

The Pennsylvania Supreme Court has held that, in light of this implied covenant, a franchisor may terminate a franchise relationship only if consistent with "principles of good faith and commercial reasonableness." Atl. Richfield Co. v. Razumic, 390 A.2d 736, 742-43 (Pa. 1978). That court has also suggested that the Razumic standards are applicable only in the context of a franchisor's termination of a franchise and do not extend to other conduct.[10] Witmer v. Exxon Corp., 434 A.2d 1222, 1227 (Pa.

---

10. District courts within the Third Circuit disagree about whether the implied duty of good faith and fair dealing applies to conduct other than termination of the franchise. Compare Bishop v. GNC Franchising LLC, 403 F. Supp. 2d 411, 418-19 (W.D. Pa. 2005), with AAMCO Transmissions, Inc. v. Harris, 759 F. Supp.
(continued...)

1981).  Relying on language in <u>Witmer</u>, this court has applied the <u>Razumic</u> standard to cases in which the franchisor indirectly terminates a franchise agreement.  See <u>Cottman Transmission Sys. LLC v. Kershner</u>, 536 F. Supp. 2d 543, 555-56 (E.D. Pa. 2008). For example, a "franchisor's failure to provide necessary and promised support to the franchisee, which forced the franchisee to close the store, constitutes bad faith termination actionable" under the implied duty of good faith and fair dealing.  <u>Id.</u>

In Count II, the Slaterbecks re-allege that Vino 100 and Tinder Box failed to provide the contractually-required training, operations manual, and promotional materials.  As discussed above, these alleged failures are remediable under a breach of contract claim.  A claim for a breach of the covenant of good faith and fair dealing is not available where another cause of action may supply a remedy.  <u>Bicycle Corp.</u>, 1995 WL 695090, at *4.

Similarly, the alleged misrepresentations that Vino 100 or Tinder Box made prior to signing the franchise agreements do not support a claim for breach of the implied covenant of good faith and fair dealing.  The Slaterbecks contend that Vino 100 misrepresented the earnings the Atlanta store could generate, the desirability of its location, and the availability of proprietary wines.  They also maintain that information presented in the UFOC was inaccurate.  Vino 100 and Tinder Box made these allegedly

---

10.(...continued)
1141, 1147-49 (E.D. Pa. 1991).

false statements before the Slaterbecks signed the franchise agreements. Thus, these statements do not constitute the post-contract behavior that the covenant of good faith and fair dealing prohibits. Id. Also, as noted above, Vino 100 was under no obligation to assist the Slaterbecks in obtaining inventory. The implied covenant of good faith and fair dealing cannot be used to impose an obligation that a party explicitly disclaimed in the contract. Witmer, 434 A.2d at 1227.

Count II fails to state a claim for breach of the implied covenant of good faith and fair dealing and must be dismissed.

V.

Counts III, IV, and V allege negligent misrepresentation, intentional misrepresentation, and fraudulent inducement, respectively. Each of these three claims assert that Vino 100 and Tinder Box made false statements about the benefits of owning a franchise and that the Slaterbecks relied on these statements to their detriment. Specifically, the Slaterbecks allege that Vino 100 and Tinder Box misrepresented the amount of money their franchise would generate and the amount of support the franchisors would provide.

These three counts of the counterclaim may not be maintained in light of Pennsylvania's parol evidence rule. The Pennsylvania Supreme Court has explained:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the

> writing to be not only the best, but the
> only, evidence of their agreement. All
> preliminary negotiations, conversations and
> verbal agreements are merged in and
> superseded by the subsequent written contract
> ... and unless fraud, accident or mistake be
> averred, the writing constitutes the
> agreement between the parties, and its terms
> and agreements cannot be added to nor
> subtracted from by parol evidence.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell & Co., 126 A. 791, 792 (Pa. 1924)). While the parol evidence rule allows a party to prove that fraud, accident, or mistake resulted in an error in the execution of a contract, parol evidence is inadmissible to prove one party fraudulently induced another to enter into a contract. Id. at 437 n.26; Bardwell v. Willis Co., 100 A.2d 102, 104 (Pa. 1953).

There is no doubt that the franchise agreements and Addendum at issue here embody the parties' entire agreements. Both the Vino 100 and Tinder Box franchise agreements contain the following language in a section titled "Entire Agreement":

> This Agreement and the documents referred to
> herein constitute the entire, full, and
> complete Agreement between Franchisor and
> Franchisee concerning the subject matter
> hereof, and supersede all prior agreements,
> no other representations having induced
> Franchisee to execute this Agreement.

The Addendum contains similar language. Thus, the Slaterbecks may not rely on pre-contract representations by Vino 100 or Tinder Box to state claims for negligent misrepresentation, intentional misrepresentation, or fraudulent inducement. See

-14-

Kershner, 536 F. Supp. 2d at 553-54; 1726 Cherry St. Partnership v. Bell Atl. Props., Inc., 653 A.2d 663, 670 (Pa. Super. Ct. 1995).

VI.

Count VII of the counterclaim alleges that Vino 100 and Tinder Box violated Georgia's Fair Business Practices Act ("FBPA"), GA. CODE ANN. § 10-1-390 et seq. Vino 100 and Tinder Box argue that the Slaterbecks are barred from bringing this claim because the parties elected Pennsylvania law to govern the franchise contracts.

Pennsylvania courts generally honor a parties' choice of law provision when interpreting a contract. Nationwide Mut. Ins. Co. v. West, 807 A.2d 916, 920 (Pa. Super. Ct. 2002). A choice of law provision, however, only governs claims arising from the contract unless the provision suggests the parties intended it to govern all aspects of their association. Caton v. Leach Corp., 896 F.2d 939, 943 (5th Cir. 1990); Smith v. Lincoln Beneficial Life Co., Case No. 08-1324, 2009 WL 789900, at *7-*8 (W.D. Pa. Mar. 23, 2009); Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc., 848 F. Supp. 569, 576 (E.D. Pa. 1994).

The choice of law provision in both franchise agreements states:

> This Agreement shall ... be interpreted and construed under the laws of the state in which the Franchisor's principal place of business is located, which laws shall prevail in the event of any conflict of law; provided, however, that if any provision of this Agreement would not be enforceable under

>             the laws of the state in which the
>             Franchisor's principal place of business is
>             located, and if the Franchised Business is
>             located in a state other than the state in
>             which Franchisor's principal place of
>             business is located, and further, if such
>             provision would be enforceable under the laws
>             of the state in which the Franchised Business
>             is located, then such provision shall be
>             interpreted and construed under the laws of
>             the state in which the Franchised Business is
>             located.

(emphases in original).

Here, the choice of law provision requiring the application of Pennsylvania law is limited to the interpretation and construction of the franchise agreements and Addendum. This language does not attempt to define the law that will govern all of the parties' legal relations. Compare Composiflex, Inc. v. Advanced Cardiovascular Sys., Inc., 795 F. Supp. 151, 157 (W.D. Pa. 1992) with Smith, 2009 WL 789900, at *7.

For a party to recover under Georgia's FBPA, it must show that the defendant engaged in "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." GA. CODE ANN. § 10-1-393. The statute broadly defines trade and commerce as "advertising, distribution, sale, lease, or offering for distribution, sale, or lease of any goods, services, or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever situate and shall include any trade or commerce directly or indirectly affecting the people of this state." Id. at §§ 10-1-392(a)(28).

The provisions of the FBPA may not be waived or limited by contract. Id. at § 10-1-393(c). In enacting the FBPA, the Georgia state legislature stated:

> The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and this part shall be liberally construed and applied to promote its underlying purposes and policies.

Id. at § 10-1-391(a).[11]

The Slaterbecks' claim under Georgia's FBPA is not a claim based on contractual duties but instead on allegedly deceptive practices that induced the Slaterbecks to enter a franchise agreement with Vino 100 and Tinder Box. Thus, Count VII is not a claim within the ambit of the choice of law provision in the franchise agreements.

We decline to address the statute of limitations argument without further factual development.

## VII.

Count IX of the counterclaim asks the court to declare that the franchise agreements are unenforceable because three of the terms are unconscionable. First, if the Slaterbecks desired to litigate a dispute arising from the agreements, Vino 100 or

---

11. Vino 100 and Tinder Box argued that the Slaterbecks lack standing to pursue a claim under the FBPA for the first time in their reply brief. Accordingly, we do not consider that argument here. See United States v. Martin, 454 F. Supp. 2d 278, 281 n. 3 (E.D. Pa. 2006).

Tinder Box could require the Slaterbecks to submit the dispute to mediation.  Second, both parties agreed to waive any right to a jury trial.  Finally, as discussed above, under the Vino 100 franchise agreement (but not the Tinder Box franchise agreement), the Slaterbecks are required to bring any lawsuit for breach of contract against Vino 100 within one or two years of the act giving rise to that cause of action.  Vino 100, in contrast, did not agree to limit the time within which it must file such claims against the Slaterbecks.

Under Pennsylvania law, a contract is unconscionable if it is both procedurally and substantively unconscionable.  "Thus, unconscionability requires a two-fold determination:  that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions."  Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (internal quotations and alterations omitted).  The Slaterbecks have cited no authority holding that contract terms such as those described in Count IX are substantively unconscionable.  The court has reviewed both franchise agreements and the Addendum and concludes that they are not "unreasonably favorable" to Vino 100 or Tinder Box.  Count IX will be dismissed.