IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VINO 100, LLC, et al.          :          CIVIL ACTION
                               :
          v.                   :
                               :
SMOKE ON THE WATER, LLC, et al. :          NO. 09-4983


MEMORANDUM

Bartle, J.                                      March 30, 2012

        This action involves a dispute between a franchisor, a
franchisee, and the guarantors of the franchisee.

        Plaintiffs Vino 100, LLC ("Vino 100") and The Tinder
Box International, Ltd. ("Tinder Box") filed this action against
defendants Smoke on the Water, LLC ("SOTW") and Thomas and Jane
Slaterbeck for breach of five contracts related to the
defendants' acquisition of Vino 100 and Tinder Box franchises in
Atlanta, Georgia.  Plaintiffs also claim that defendants engaged
in unlicensed use of Vino 100 and Tinder Box trademarks while
operating the franchise store, an alleged violation of the Lanham
Act, 15 U.S.C. §§ 1114, 1125.

        Defendants counterclaimed against plaintiffs for breach
of their contractual obligations to provide defendants with
marketing materials to be used in promoting the franchised
businesses.  Defendants further allege that plaintiffs violated
Georgia's Fair Business Practices Act, Ga. Code Ann. § 10-1-390,
et seq., by making certain false and misleading statements in the

negotiations that led the defendants to purchase a Vino 100 franchise.

Before the court is the motion of plaintiffs for summary judgment as to all claims in their complaint and the defendants' counterclaim.[1]

I.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the moving party. Id. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could

---

1.  We have subject-matter jurisdiction over the plaintiffs' Lanham Act claim in Count VI of the complaint pursuant to 28 U.S.C. § 1331.  We have subject-matter jurisdiction over plaintiffs' state-law claims in Counts I through V of the complaint and defendants' state-law counterclaims pursuant 28 U.S.C. § 1332(a).  The parties are of diverse citizenship and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a).  Moreover, we may exercise supplemental jurisdiction over the parties' state-law claims because they share a common nucleus of operative fact with the plaintiffs' Lanham Act claim.  See id. at § 1367; De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 307-08 (3d Cir. 2003).

reasonably find for the plaintiff."  <u>Anderson</u>, 477 U.S. at 252.
We view the facts and draw all inferences in favor of the
non-moving party.  <u>Boyle v. Cnty. of Allegheny</u>, 139 F.3d 386, 393
(3d Cir. 1998).  When ruling on a motion for summary judgment, we
may only rely on admissible evidence.  <u>See, e.g.</u>, <u>Blackburn v.
United Parcel Serv., Inc.</u>, 179 F.3d 81, 95 (3d Cir. 1999).

                                II.

          For present purposes, we recite the facts in the light
most favorable to defendants, the non-movants.

          Since 1965, Tinder Box has licensed franchises for
retail stores that sell tobacco products and related goods.  In
July 2003, Vino 100 began franchising retail stores that purvey
wine and wine-related gifts and accessories.  The parties agree
that Tinder Box and Vino are affiliated, but the extent and
nature of their affiliation is unclear.  It is undisputed that
the two companies currently have a common president, Wayne Best.
During the times relevant to this action, Tinder Box and Vino 100
also appear to have had some common employees, including Best,
Robert Craft and Gary Blumenthal.

          Beginning in January 2005, the Slaterbecks began
discussing with Craft the possibility of investing in a Vino 100
or Tinder Box franchise.  The Slaterbecks became interested in
owning a joint Vino 100 and Tinder Box franchise store inside a
casino similar to a store plaintiffs were operating in the
Tropicana casino in Atlantic City, New Jersey.  Following a
series of telephone calls and meetings at the plaintiffs'

                               -3-

Pennsylvania corporate offices, the Slaterbecks decided in
February 2005 to invest in a joint Tinder Box and Vino 100 store
in a casino.

The Slaterbecks formed SOTW on March 30, 2005 and
became its only members.  On April 22, 2005, SOTW entered into
franchise agreements with Vino 100 and Tinder Box that permitted
SOTW to open a joint franchise store inside a casino at a
location to be determined later.  For reasons that are disputed
and are not relevant for present purposes, the defendants did not
locate an acceptable casino venue for the joint Vino 100/Tinder
Box franchise store.

In June 2005, Craft called Thomas Slaterbeck to inquire
whether the Slaterbecks would be interested in acquiring from
Tinder Box a company-owned retail business at the Lenox Square
Mall in Atlanta, Georgia.[2]  The Tinder Box business at the Lenox
Square Mall (the "Lenox store") had been in operation there for
over 30 years.  After several additional conversations with
Craft, Thomas Slaterbeck had a conference call with Craft and
Blumenthal.  During this conference call, Craft and Blumenthal
represented that the Lenox store "breaks even" and had a
competent general manager.  Craft and Blumenthal suggested the
Slaterbecks add a Vino 100 franchise to the existing Tinder Box
operation at the Lenox store.  According to Slaterbeck, they told

_____

2.  Defendants refer to the mall as the "Lennox Hill" Mall.  The
website of the mall's owner, the Simon Property Group, confirms
that the correct title is the "Lenox Square Mall."

him that adding a Vino 100 franchise would contribute $400,000 in gross annual revenue to the store's existing sales.  Craft and Blumenthal said that as a Vino 100 franchisee, the Slaterbecks would have access to private label wines that would not be available to other sellers.  In subsequent phone conversations with Thomas Slaterbeck, Craft repeated his statement that the inclusion of a Vino 100 franchise at the Lenox store would add $400,000 in sales.  In early June 2005, Thomas Slaterbeck met with Craft, Blumenthal, and Best at plaintiffs' offices.  At this meeting, Slaterbeck was advised that of the $400,000 in sales a Vino 100 franchise would add to the Lenox store, $200,000 would be profit because the wines would be sold at "keystone" pricing.[3]

Thereafter, on June 15, 2005, the parties executed the series of contracts that give rise to the claims in this lawsuit. First, SOTW agreed to purchase all of the inventory, furniture, fixtures and other assets in the Lenox store for approximately $300,000.  Next, SOTW signed franchise agreements with both Tinder Box and Vino 100.  These franchise agreements permitted SOTW to operate both franchises for an initial term of 15 years.

Although these franchise agreements were lengthy, only a few provisions are relevant for present purposes.  They licensed SOTW to use Vino 100 and Tinder Box trademarks in

_____

3.  Although defendants have not defined this term, we understand the term "keystone pricing" typically denotes a 100% markup on retail goods over the wholesale price.  See The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1150-51 (9th Cir. 1988); Garment Dist., Inc. v. Belk Stores Servs. Inc., 799 F.2d 905, 907 (4th Cir. 1986).

connection with the Lenox store.  Vino 100 and Tinder Box
promised to "make available to [SOTW], from time to time, at
[SOTW's] expense, advertising plans and promotional materials."

The franchise agreements described a number of
circumstances that would permit Vino 100 and Tinder Box to
terminate those agreements immediately.  One such event would
occur if SOTW "is in default under its lease or sublease" for the
Lenox store "and fails to cure said default within the time
period, if any, provided in the lease or sublease."  SOTW and
plaintiffs also agreed that if "the appropriate licensing
authorities refuse to grant [SOTW] the necessary licenses,
permits and approvals required to operate the [Vino 100] Store,"
SOTW may immediately terminate the Vino 100 franchise agreement
and obtain a partial refund of the franchisee fee.

The franchise agreements further obligated SOTW to pay
royalty fees to Vino 100 and Tinder Box on a monthly basis.
These fees were to be calculated as a percentage of the Lenox
store's gross sales.  The Tinder Box franchise agreement provided
that SOTW must pay 4% of the store's gross sales, and the Vino
100 franchise agreement required SOTW to pay the greater of
$1,000 or 5% of monthly gross sales.  On June 15, 2005, the same
day plaintiffs and SOTW signed the franchise agreements,
plaintiffs and SOTW also signed an addendum that modified, among
other things, the royalty terms in the franchise agreements.
That modification read in part:  "Notwithstanding the provisions
... of the Agreements (regarding "Fees"), the parties acknowledge

-6-

and agree that [SOTW] shall pay a continuing monthly royalty fee in an amount equal to 5% of the combined Gross Sales ... of the Store."

In both franchise agreements was a provision that the written contract constituted the entire agreement between the parties and that "no other representations hav[e] induced Franchisee to execute this Agreement."  Another provision in both stated that "Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement."

Each of the franchise agreements contained a "franchise disclosure questionnaire" that the Slaterbecks signed on June 8, 2005.  The Tinder Box questionnaire asked the following questions:

> Has any employee or other person speaking on behalf of Tinder Box made any statement or promise concerning the revenue, profits or operating costs of Tinder Box [sic] store or cart operated by Tinder Box or its franchisees?
> Has any employee or other person speaking on behalf of Tinder Box made any statement or promise concerning a Tinder Box store or cart that is contrary to, or different from, the information contained in the Offering Circular?
> Has any employee or other person speaking on behalf of Tinder Box made any statement or promise regarding the amount of money you may earn in operating a Tinder Box store or cart?

The Slaterbecks answered "No" to each of these questions.  The
Vino 100 questionnaire contained nearly identical questions and
the Slaterbecks responded in the negative to each of these
questions on that document as well.[4]  Thomas Slaterbeck asserts
in an affidavit that Blumenthal, Craft, and another of
plaintiffs' representatives instructed the Slaterbecks on what
answers to give to all these questions.

On June 15, 2005, in addition to the two franchise
agreements and addendum, SOTW agreed to sublease the Lenox store
from Tinder Box.  The sublease required SOTW, among other things,
to pay directly to the landlord all rent that Tinder Box owed
under the original lease agreement.

Both the franchise agreements as well as the sublease
specified that a default on one of those contracts constituted a
default on the others as well.  In the event of SOTW's default on
the sublease, Tinder Box was permitted to exercise against SOTW
any remedy that the landlord could exercise against Tinder Box
under the terms of the original lease.  Tinder Box's lease with
the landlord contained an acceleration clause that permitted the
landlord immediately to recover from Tinder Box rent due for the
unexpired lease term in the event of Tinder Box's breach of its
obligation to pay rent.

---

4.  The questionnaires do not mention SOTW, and the Slaterbecks
did not purport to sign the questionnaires in their capacity as
members of SOTW.

Besides the above documents, SOTW executed a security agreement on June 15, 2005 that gave Tinder Box a first priority lien on essentially all of SOTW's presently-owned and later-acquired property to secure SOTW's performance of its obligations under the Tinder Box franchise agreement.  Finally, the Slaterbecks signed contracts on the same day in which they personally guaranteed SOTW's performance of its obligations under the two franchise agreements and the sublease.

SOTW began operation of the Tinder Box franchise at the Lenox store in July 2005.  It obtained a liquor license for the Lenox store and expended considerable funds remodeling the facility to accommodate a Vino 100 franchise.  The Vino 100 component of the Lenox store opened in March 2007.  After performing this renovation and opening the Vino 100 component of the Lenox store, defendants learned that Georgia's laws concerning the sale of alcohol prevented SOTW from offering any private label wines at the Lenox store, from selling wine on Sundays, or from conducting in-store wine tastings.[5]

The profit and loss statements for the Lenox store reflect that it did not generate net income for any of the years SOTW operated it.  SOTW fell behind on the rent and on its royalty payments to plaintiffs.

---

5.  It is unclear whether Vino 100 had any other franchise stores in Georgia when SOTW signed the franchise agreements in June 2005.  Vino 100's website claims to have a Vino 100 location in Alpharetta, Georgia, but does not say when this store opened.  See Vino 100 Locations, http://www.vino100.com/locations.fx (last visited March 25, 2012).

-9-

In March 2008, SOTW attempted to terminate the April
2005 franchise agreements related to the joint franchise store in
a casino location in order to obtain a refund of a franchise fee
that had been paid to plaintiffs.  As noted above, before signing
the franchise agreements related to the Lenox store, SOTW signed
franchise agreements with plaintiffs in April 2005 for a store in
a casino location, but a suitable location inside a casino was
not identified and no store was opened under those franchise
agreements.  Negotiations between the parties ensued, and in
October 2008, Best sent the Slaterbecks a letter with the subject
line "Resolution Proposal."[6]  In the letter, Best set forth the
terms of a resolution to which the parties had agreed orally
during a phone conversation.  Best's letter states that
plaintiffs would agree to terminate the April 2005 franchise
agreements related to the casino location and to give a partial
refund of the franchise fee in the form of a credit against
SOTW's past-due royalties.  Plaintiffs also agreed to reduce the
royalty rate from 5% to 4% and to apply this reduction
retroactively.  The letter stipulated that defendants "must
submit all past due royalty reports and pay all past due royalty
fees and other charges due Vino 100 and [Tinder Box]."  If
defendants were unable to pay the full amount due, Best said
plaintiffs would consider a payment plan.  The letter enclosed

_____

6.  Best addressed the letter to the Slaterbecks personally, and
mentioned SOTW only once, in the recipients' address block above
the subject line and salutation.

revised franchise agreements embodying the reduced royalty rate and concluded by saying, "This offer will expire on Friday, October 17, 2008."  For reasons that are not explained in the record, SOTW did not sign the revised Lenox store franchise agreements.  It is undisputed, however, that SOTW paid only 4% of its gross sales in royalties during the months that it made such payments.

SOTW stopped paying rent for the Lenox store in May 2009.  The landlord issued Tinder Box a notice of default on July 24, 2009 in which it stated that Tinder Box owed $34,526.52 in back rent.  On July 31, 2009, Tinder Box and Vino 100 sent the Slaterbecks a notice concerning SOTW's non-payment of rent and royalties and notifying the Slaterbecks that SOTW's failure to pay all rent and royalties may result in termination of the franchise agreements.[7]  In August 2009, the landlord initiated an eviction proceeding against Tinder Box, the lessee of the Lenox store property.  It is undisputed that SOTW failed to pay rent required under the sublease for the period May 2009 through October 2009.  The parties also agree that SOTW failed to pay any royalty fees for the months August through December 2007, January 2008 through March 2008, May 2008, July 2008 through December

---

7. The letter was addressed to the Slaterbecks personally.  The letter mistakenly implied that the Slaterbecks, not SOTW, signed the sublease with Tinder Box.  In some places, the letter also incorrectly stated that the Slaterbecks were plaintiffs' franchisees.

2008, and January 2009 through October 2009.  The Slaterbecks, as guarantors, did not pay any of these amounts on SOTW's behalf.

On October 15, 2009, with eviction from the Lenox store imminent, the Slaterbecks directed a SOTW employee to send an email to the store's customers alerting them that the Lenox store would be holding a going out of business sale the following day. Tinder Box and Vino 100 learned of the proposed going out of business sale and faxed a cease and desist notice to the Lenox store.  The notice stated that a going out of business sale was prohibited under the terms of the franchise agreements, sublease, and security agreement.[8]  The notice also declared that Vino 100 and Tinder Box had terminated the franchise agreements for the Slaterbecks' failure to cure SOTW's default on the sublease and franchise agreements.[9]  Vino 100 and Tinder Box instructed defendants to cease immediately the use of any of their trademarks, service marks, logos, or other proprietary marks.

The Slaterbecks were present in the Lenox store on October 15.  They received the faxed cease and desist notice, and

8.  The notice does not specify which provision of the franchise agreements, sublease, or security agreement prohibited defendants from holding such a sale.  The notice implies that a liquidation sale would violate plaintiffs' first-priority lien on defendants' business assets.

9.  As with the July 31 notice, the October 15 notice was addressed to the Slaterbecks personally.  This notice, like the July notice, mistakenly implied that the Slaterbecks personally signed the sublease.  The first paragraph of the October notice acknowledged that SOTW signed the franchise agreements but in the remainder of the notice discussed the obligations under the franchise agreements as if they were owed by the Slaterbecks.

after speaking with their attorney, an employee sent a second email to the store's customers canceling the proposed going out of business sale.  Nevertheless, the Lenox store was open for business on October 16, 2009.  After closing the store on October 16, neither SOTW nor the Slaterbecks did any further business as Vino 100 or Tinder Box franchisees.

Plaintiffs filed this action two weeks later, on October 30, 2009.  In Counts I through V of the complaint, Tinder Box and Vino 100 sued SOTW and the Slaterbecks for breach of contract.  Count I alleges that SOTW breached the sublease for the Lenox store, while Count II claims that the Slaterbecks breached their contract guaranteeing SOTW's performance under the sublease.  Count III asserts that SOTW breached the two franchise agreements, and Count IV alleges that the Slaterbecks breached their guaranty of SOTW's performance under those two franchise agreements.  In Count V, plaintiff Tinder Box contends that SOTW breached the security agreement by holding a liquidation sale on October 16, 2009.  Finally, Count VI asserts that all three defendants engaged in trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125.

Following a failed effort at settlement, defendants filed an answer and a nine-count counterclaim.  The majority of the counterclaim has been dismissed and only two counts remain.[10]

---

10.  In May 2011, in response to plaintiffs' motion to dismiss, defendants voluntarily dismissed Counts VI and VIII of the counterclaim.  In a memorandum and order dated July 1, 2011, the
(continued...)

In Count I of the counterclaim, defendants assert that plaintiffs breached their contractual obligation to provide defendants with marketing materials to be used in promoting the Lenox store.[11] Count VII of the counterclaim alleges that plaintiffs violated the Georgia Fair Business Practices Act, GA. CODE ANN. § 10-1-390, et seq., in misrepresenting the sales and costs associated with owning a Vino 100 franchise.

III.

As noted above, Counts I through V of the complaint state claims for breach of contracts related to defendants' operation of the Lenox store.  Plaintiffs allege that SOTW breached the two franchise agreements, the sublease, and the security agreement, and that the Slaterbecks breached the personal guarantee contracts they made concerning SOTW's performance under the sublease and franchise agreements.

In order to prove breach of contract under Pennsylvania law, a plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates

---

10.(...continued)
court dismissed portions of Count I and all of Counts II, III, IV, V, and IX of the counterclaim.  Recently, in response to plaintiffs' motion for summary judgment, defendants dismissed a further allegation from Count I.  Thus, only a portion of Count I and Count VII of the counterclaim remain.

11.  All three defendants bring Count I of the counterclaim notwithstanding that the Slaterbecks are not parties to the Vino 100 and Tinder Box franchise agreements.

<u>Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).[12]  Defendants do not dispute that they breached the five contracts at issue in Counts I through V of the complaint. Instead, defendants argue that these contracts are void as against public policy.

Defendants assert that in negotiating the terms of these contracts plaintiffs engaged in unfair business practices prohibited by § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and that such conduct renders the resulting contracts void as against the public policy of Pennsylvania.  More specifically, defendants maintain that plaintiffs violated a Federal Trade Commission ("FTC") regulation commonly known as Rule 436.  <u>See</u> 16 CFR § 436.9(c).  Generally, Rule 436 specifies that franchisors must provide to prospective franchisees disclosure documents that contain prescribed information about the business opportunity being offered.  16 C.F.R. §§ 436.2, 436.5.  A franchisor's failure to disclose the information required by Rule 436 is an unfair or deceptive trade practice that violates § 5 of the Federal Trade Commission Act.  <u>Id.</u> at § 436.2.  Section 5 makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and it empowers the FTC to prevent

---

12.  No party suggests that any contract referenced in the complaint should be decided under law other than the law of Pennsylvania.  Both franchise agreements and both of the Slaterbecks' personal guarantee contracts provide that they shall be interpreted in accordance with Pennsylvania law.

individuals and businesses from engaging in such conduct.   15
U.S.C. § 45(a)(1)-(2).

One provision of Rule 436 states that it is an unfair
or deceptive trade practice to "[d]isseminate any financial
performance representations to prospective franchisees unless the
franchisor has a reasonable basis and written substantiation for
the representation at the time the representation is made, and
the representation is included in Item 19 (§ 436.5(s)) of the
franchisor's disclosure document."  Id. at § 436.9(c).  Accepting
for present purposes the facts in the light most favorable to
defendants, the non-moving parties, Craft of Vino 100 and Tinder
Box told Thomas Slaterbeck that adding a Vino 100 franchise to
the Lenox store would increase sales by $400,000 and profits by
$200,000.  Plaintiffs provided defendants with the Vino 100
disclosure documents required by Rule 436 on or about
February 18, 2005.  Item 19 of that disclosure document reads,
"We do not furnish or authorize our salespersons to furnish any
oral or written information concerning the actual or potential
sales, costs, income or profits of a Vino 100 franchise.  Actual
results may vary from unit to unit and we cannot estimate the
results of any particular franchise."  Because Craft's statements
to Thomas Slaterbeck regarding the income defendants could expect
at the Lenox store were not presented in the Vino 100 disclosure
document, defendants assert this omission violated Rule 436.

Defendants' argument that Pennsylvania public policy
incorporates the specific prohibitions and disclosure

requirements of Rule 436 is without merit.  Under Pennsylvania
law, courts will not enforce contracts that have an "evil
tendency ... opposed to the interests of the public."  Kuhn v.
Buhl, 251 Pa. 348, 370 (1916).  For a contract to be invalid, it
must conflict with well-defined public policies of this
Commonwealth.  Williams v. GEICO Gov't Emps. Ins. Co., 32 A.3d
1195, 1200 (Pa. 2011).  As the Pennsylvania Supreme Court has
explained:

> Public policy is to be ascertained by
> reference to the laws and legal precedents
> and not from general considerations of
> supposed public interest.  As the term
> "public policy" is vague, there must be found
> definite indications in the law of the
> sovereignty to justify the invalidation of a
> contract as contrary to that policy. ...
> Only dominant public policy would justify
> such action.  In the absence of a plain
> indication of that policy through long
> governmental practice or statutory
> enactments, or of violations of obvious
> ethical or moral standards, the Court should
> not assume to declare contracts ... contrary
> to public policy.

Hall v. Amica Mut. Ins. Co., 648 A.2d 755, 760 (Pa. 1994)

(quoting Muschany v. United States, 324 U.S. 49, 66-67 (1945)).

Defendants have not cited any cases or statutes suggesting that

the public policy of Pennsylvania embraces Rule 436 or other

regulations promulgated by the FTC.  Nor have defendants pointed

us to any authority supporting the conclusion that there is an

established public policy in the Commonwealth concerning the

information that must be presented to prospective franchisees.

The defendants' invocation of Rule 436 and the public policy of Pennsylvania is a thinly-veiled effort to establish a claim of fraud in the inducement. In Pennsylvania, "Where prior fraudulent representations are alleged, the parol evidence rule bars such representations where the written agreement: (1) contains terms which directly deal with the subject matter of the alleged oral representation; and (2) represents the entire contract between the parties." Atl. Pier Assocs., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 489 (E.D. Pa. 2009); see AAMCO Transmissions, Inc. v. Wirth, No. 11-4250, 2011 U.S. Dist. LEXIS 140457, at *12 (E.D. Pa. Dec. 7, 2011).

As noted above, the Vino 100 franchise agreement and the addendum state that they represent the entire agreement between Vino 100 and SOTW. The Vino 100 franchise agreement also states in multiple places that the franchisor has not made any representations concerning the income or costs SOTW may experience as franchisee. In partially granting plaintiffs' motion to dismiss the counterclaim, the court explained that Pennsylvania's parol evidence rule prevented defendants from bringing a counterclaim against plaintiffs for fraud in the inducement based on alleged misrepresentations plaintiffs made before SOTW executed the franchise agreements.[13] Vino 100, LLC v. Smoke on the Water, LLC, No. 09-4983, 2011 U.S. Dist. LEXIS

13. Even though only SOTW signed the franchise agreements, Thomas and Jane Slaterbeck joined SOTW in bringing the counterclaim for fraudulent inducement to enter the franchise agreements.

-18-

71172, at *16-*18 (E.D. Pa. July 1, 2011).  The operation of Pennsylvania's parol evidence rule to bar claims for fraudulent inducement under these circumstances further undermines defendants' argument that the public policy of the Commonwealth requires the court not to enforce the contracts at issue in Counts I through V of the complaint.

Furthermore, defendants' effort to incorporate into Pennsylvania public policy the specific prohibitions and disclosure requirements of Rule 436 is in effect an attempt by a private party to enforce the terms of Rule 436 against another private party.  As noted above, Rule 436 defines conduct that the FTC considers a violation of § 5 of the Federal Trade Commission Act.  See 16 C.F.R. § 436.9.  Private parties, however, are not permitted to enforce § 5 of the Federal Trade Commission Act. Only the FTC may do so.  See Holloway v. Bristol-Myers Corp., 485 F.2d 986, 987, 1001 (D.C. Cir. 1973); Klein Sleep Prods. v. Hillside Bedding Co., No. 83-4014, 1983 U.S. Dist. LEXIS 19179 (S.D.N.Y. Feb. 17, 1983).  Accordingly, a franchisee may not use a franchisor's alleged noncompliance with Rule 436 to invalidate a franchise contract or to recover damages.  See Freedman v. Meldy's, Inc., 587 F. Supp. 658, 659-62 (E.D. Pa. 1984).  At least one other federal district court has found that a franchisor's alleged noncompliance with Rule 436 does not render the resulting franchise contract void as against public policy. See Holiday Hospitality Franchising, Inc. v. 174 West St. Corp.,

No. 05-1419, 2006 U.S. Dist. LEXIS 49177, at *13-18 (N.D. Ga. July 19, 2006).

The undisputed facts demonstrate that plaintiffs and SOTW entered into the Vino 100 and Tinder Box franchise agreements, a sublease, and a security agreement, and that the Slaterbecks personally guaranteed SOTW's performance under the franchise agreements and sublease.  The undisputed facts further establish that defendants breached the terms of those contracts as alleged in Counts I through V of the complaint.  These contracts are not void as against public policy.  Thus, plaintiffs are entitled to summary judgment with respect to the first two elements of the breach of contract claims in Counts I through V of the complaint, that is, the existence of the contracts at issue and a breach by defendants of duties imposed by those contracts.  See Ware, 322 F.3d at 225.

IV.

We now turn to the issue of damages for those breaches.

Plaintiff Tinder Box maintains that SOTW's breach of the sublease, as alleged in Count I of the complaint, and the Slaterbecks' breach of their guarantee of SOTW's performance on the sublease, as alleged in Count II of the complaint, entitle it to recover from defendants the rent for the Lenox store that SOTW failed to pay to the landlord.  The sublease that SOTW signed and that the Slaterbecks guaranteed, specifically permits Tinder Box to recover any amount of back due rent that the landlord could recover from Tinder Box.

-20-

Neither SOTW nor the Slaterbecks paid to Tinder Box the rent for the Lenox store owed to the landlord between May 2009 and October 2009 when SOTW occupied the Lenox store.  In an affidavit, plaintiffs' president Wayne Best asserts that the unpaid rent for this period is $69,458.55 and that this "amount remains outstanding."[14]

Defendants do not contest the accuracy of this figure.[15]  Instead, they attempt to characterize these damages as a "windfall."  Under Pennsylvania law, the preferred remedy for a breach of contract is expectation damages, which is the amount of money necessary to put a plaintiff in the position it would have enjoyed but for the defendant's breach.  See Ferrer v. Trs. of the Univ. of Pa., 25 A.2d 591, 610 (Pa. 2002).  Defendants observe correctly that Tinder Box has submitted no evidence that it paid the landlord any back due rent or that the landlord has filed suit or has otherwise attempted to collect from Tinder Box the rent it is owed.  Defendants argue that without such evidence, Tinder Box has not shown that it has been damaged and that an award of the back rent would put it in a better position than it would have enjoyed had SOTW or the Slaterbecks paid the landlord the rent.

---

14.  It is unclear whether Best is describing as "outstanding" defendants' indebtedness to Tinder Box under the sublease or Tinder Box's obligation to the landlord under the lease.

15.  Defendants have not argued, for example, that Tinder Box is only entitled to recover half of the rent due for October 2009 because Tinder Box terminated the sublease on the 15th of that month.

Defendants have not come forward with any evidence, however, that calls into question the existence of Tinder Box's obligation to the landlord under the lease.[16]  There is no evidence that the landlord has abandoned its right to collect the unpaid rent from Tinder Box or that Tinder Box settled its debt to the landlord for less than it seeks in damages here.  The only inference to be drawn from the documents in the record is that Tinder Box remains indebted to the landlord in the amount it is seeking.  In these circumstances, an award of damages for unpaid rent due under the sublease is a valid item of expectation damages.

Accordingly, Tinder Box is entitled to judgment in its favor and against SOTW on Count I of the complaint in the amount of $69,458.55.  Tinder Box is also entitled to judgment in its favor and against Thomas and Jane Slaterbeck as guarantors on Count II of the complaint in the amount of $69,458.55.  SOTW and the Slaterbecks are liable for this amount jointly and severally.

V.

Plaintiffs argue that they are entitled to recover as damages under Count III of the complaint those franchise royalty fees that SOTW failed to pay during the existence of the

---

16.  During his deposition, Thomas Slaterbeck testified that SOTW was being evicted in mid-October 2009 because the landlord had found a new tenant to take over the store.  Tinder Box is not seeking from defendants rent that was due for months after October 2009.  We presume that the landlord is not seeking rent or partial rent from Tinder Box for the remainder of the lease notwithstanding the acceleration clause in the landlord's lease with Tinder Box because it has mitigated its damages.

franchise relationship.  Plaintiffs maintain that they may also collect these past-due royalties from Thomas and Jane Slaterbeck as guarantors, as alleged in Count IV of the complaint. Plaintiffs claim that SOTW was obligated to pay 5% of the Lenox store's monthly gross sales and that the Slaterbecks were obliged to ensure SOTW paid such amounts.  It is undisputed that neither SOTW nor the Slaterbecks paid royalties to plaintiffs for 25 months:  August through December 2007, January through March 2008, May 2008, July through December 2008, and January through October 2009.  Plaintiffs calculate that the unpaid royalties due for this time period total $73,889.61.  This represents 5% of SOTW's actual gross sales for the 25 months at issue except for August and September 2009.  Plaintiffs have estimated the gross sales for these two months.

Defendants do not dispute that they failed to pay royalties during the 25 months at issue.  Defendants simply contest that they were obligated to pay royalties of 5% of gross sales rather than 4% of gross sales under the terms of their franchise agreement.  Defendants also argue that plaintiffs' estimated sales for August and September 2009 are inappropriate.

The Tinder Box franchise agreement for the Lenox store set SOTW's royalty fee at 4% of monthly gross sales and the Vino 100 franchise agreement for the Lenox store required a monthly royalty fee of 5% of monthly gross sales.  The plaintiffs and SOTW then executed an addendum that, as noted above, provides in part:  "Notwithstanding the provisions ... of the Agreements

-23-

(regarding "Fees"), the parties acknowledge and agree that [SOTW] shall pay a continuing monthly royalty fee in an amount equal to 5% of the combined Gross Sales ... of the Store."  The addendum specifies that its terms control in the event of any conflict between it and the terms of the two franchise agreements. Nonetheless, despite the language of the addendum, during months when royalty payments were made, SOTW remitted to Vino 100 and Tinder Box a royalty equaling 4% of gross sales.

In a letter to the Slaterbecks dated October 10, 2008,[17] Wayne Best reaffirmed plaintiffs' position that they are entitled to receive 5% of the Lenox store's gross sales.  Best then wrote, "Notwithstanding Vino 100's and [Tinder Box's] positions on these issues, it is my understanding that during our most recent conversations we reached agreement on the terms of a resolution that we both thought was fair and reasonable."  The letter then stated that plaintiffs "will agree to adjust the 5% royalty rate under the Lenox Square franchise agreements to 4%, to be retroactively applied."  Best did not specify how far into the past the 4% rate would be applied.  Best asked the Slaterbecks to sign revised franchise agreements (presumably in their capacity as members of SOTW) embodying the revised royalty rate of 4%.  He wrote that the Slaterbecks "must submit all past due royalty reports and pay all past due royalty fees and other

---

17.  As noted above, Best's letter of October 10, 2008 was addressed to the Slaterbecks personally and referenced SOTW only in the recipients' address block.

-24-

charges due to [plaintiffs] ... upon signing the enclosed
agreements."  If the Slaterbecks were unable to pay the full
amount of past-due royalties at once, however, plaintiffs were
willing to consider a payment plan.  Best's letter concluded by
saying that "This offer will expire on Friday, October 17, 2008."

        There is no evidence that SOTW signed the revised
franchise agreements enclosed with Best's letter.  The record
does not contain any subsequent correspondence between the
parties concerning the royalty rate.

        Both franchise agreements stated that no "amendment,
change, or variance from this Agreement shall be binding on
either party unless mutually agreed to be [sic] the parties and
executed by their authorized officers or agents in writing."
Plaintiffs argue that under this provision only a written
modification will vary defendants' obligations under the
franchise agreements and addendum.  Under Pennsylvania law,
however, "[a]n agreement prohibiting non-written modification may
be modified by a subsequent oral agreement if the parties'
conduct clearly shows an intent to waive the requirement that
amendments be in writing."  Accu-Weather, Inc. v. Prospect
Communs., Inc., 644 A.2d 1251, 1255 (Pa. Super. Ct. 1994).  The
party seeking to prove an oral modification to a written
agreement must introduce "clear, precise and convincing" evidence
that the parties modified the written agreement.  Pellegrene v.
Luther, 169 A.2d 298, 215 (Pa. 1961).

While Best's letter to the Slaterbecks mentioned an "agreement on the terms of a resolution," Best was extending to the Slaterbecks an offer to modify the terms of SOTW's franchise agreements with plaintiffs.  Ths subject line of Best's letter was "Resolution Proposal."  Best did not say that the plaintiffs "have agreed" to reduce the royalty rate but said instead that they "will agree" to reduce that rate.  It appears that two conditions of the resolution were that SOTW sign revised franchise agreements and pay past-due royalties at that time.  Neither occurred.  Finally, Best concluded the letter by saying, "This offer will expire on Friday, October 17, 2008."[18]  The record is devoid of any "clear, precise and convincing" evidence that plaintiffs and SOTW modified the royalty term of the addendum to the franchise agreements.  Pellegrene, 169 A.2d at 215.  Thus, plaintiffs are entitled to receive 5%, not 4%, of the Lenox store's sales in royalties.

Plaintiffs have estimated that SOTW had sales of $40,000 in August and September 2009.  Defendants dispute that this estimate is appropriate without suggesting a more appropriate figure or explaining why $40,000 is inaccurate.[19]

_____

18.  Defendants paid no royalties to plaintiffs between July 2008 and October 2009, so their course of dealing after the date of Best's letter does not support an inference that the parties agreed to an oral modification of the franchise agreements.

19.  Plaintiffs state that they requested the August and September 2009 sales reports in discovery, and defendants do not contest that they failed to produce sales figures for these two months.

Where no precise evidence of a plaintiff's damages exists, a plaintiff need not introduce proof that "conform[s] to the standard of mathematical exactness." Lach v. Fleth, 64 A.2d 821, 827 (Pa. 1949).  In such circumstances, a plaintiff must support its damages claim only with "a reasonable basis for calculation." Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 727 (Pa. 1964).  Defendants reported gross sales of $1,397,792.26 during the 23 of the 25 months for which their sales are known.  This averages to gross sales of $60,773.58 per month.  Moreover, during August and September 2007 and August and September 2008, defendants' sales were much higher than $40,000. During only seven months of the Lenox store's operation did SOTW have gross sales lower than $40,000.  In short, $40,000 is a reasonable estimate of the SOTW's gross sales for August and September 2009 based on the evidence in the record.

In sum, the undisputed facts show SOTW breached its obligation to pay 5% of the Lenox store's gross sales during August through December 2007, January through March 2008, May 2008, July through December 2008, and January through October 2009, as alleged in Count III of the complaint.  The Slaterbecks, as guarantors, breached their obligation to pay these amounts to plaintiffs upon SOTW's default as alleged in Count IV of the complaint.  The undisputed facts further show plaintiffs suffered harm in the amount of $73,889.61.  Plaintiffs are entitled to recover $73,889.61 in past due royalties from SOTW on Count III of the complaint and to recover $73,889.61 in past due royalties

-27-

from Thomas and Jane Slaterbeck on Count IV of the complaint,
with liability among the three defendants to be joint and
several.[20]

Plaintiffs further claim that they are entitled to
recover under Counts III and IV of the complaint the lost future
royalties they would have received had their franchise
relationship with defendants continued. Under Pennsylvania law,

> Where one party to a contract without any
> legal justification, breaches the contract,
> the other party is entitled to recover,
> unless the contract provided otherwise,
> whatever damages he suffered, provided (1)
> they were such as would naturally and
> ordinarily result from the breach, or (2)
> they were reasonably foreseeable and within
> the contemplation of the parties at the time
> they made the contract, and (3) they can be
> proved with reasonable certainty.

Ferrer, 25 A.2d at 610 (quoting Taylor v. Kaufhold, 84 A.2d 347,
351 (Pa. 1951)).  The party alleging a breach of contract has the
duty to prove the existence of damages and "damages are not
recoverable if they are too speculative, vague or contingent and
are not recoverable for loss beyond an amount that the evidence
permits to be established with reasonable certainty."  Spang &
Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988).  The
"preferred" remedy for breach of contract is expectation damages,

---

20.  The addendum to the franchise agreement required SOTW to pay
all royalties to Vino 100.  The addendum imposed on Vino 100 the
obligation to apportion between it and Tinder Box the royalty
fees received from SOTW.  Given this provision and the apparent
affiliation between the plaintiffs, we do not attempt to
determine what portion of the past-due royalties are owed to Vino
100 and what portion are owed to Tinder Box.  Plaintiffs have not
requested or provided a mathematical basis for doing so.

that is, the money that will place the injured party in the position it would have enjoyed had the contract not been breached.  <u>Atacs Corp. v. Trans World Commc'ns.</u>, 155 F.3d 659, 669 (3d Cir. 1998).  Thus, the injured party "can recover nothing more than will compensate" it for the breach.  <u>Helpin v. Trs. of the Univ. of Pa.</u>, 10 A.3d 267, 270 (Pa. 2010).

The contracts at issue in this case do not address plaintiffs' entitlement to future royalties in the event the franchise relationship is terminated.  Plaintiffs seek to recover damages through the end of the initial fifteen-year term of the franchise agreements, which would have ended on June 15, 2020. Using predictions about what the Lenox store's future sales would have been based on its past performance, plaintiffs maintain they are entitled to $289,940.00 in lost future royalties.

Defendants counter that their breach of the franchise agreement, the sublease, and the personal guarantee contracts are not the cause of the lost future royalties.  They contend that plaintiffs' decision to terminate the franchise relationship on October 15, 2009 is the proximate cause of any lost future royalties.

In cases where a franchisor terminated the franchise relationship due to a franchisee's failure to pay royalties or rent in accordance with their contract, courts have generally found that the lost future royalties were caused by the franchisor's decision to end the relationship and not by the franchisee's prior failure to comply with the contract.  <u>See</u>

Burger King Corp. v. Hinton, Inc., 203 F. Supp. 2d 1357, 1366-67 (S.D. Fla. 2002); I Can't Believe It's Yogurt v. Gunn, No. 94-2109, 1997 U.S. Dist. LEXIS 14480, at *60-*65 (D. Colo. Apr. 15, 1997); Postal Instant Press v. Sealy, 51 Cal. Rptr. 2d 365, 368-71 (Cal. Ct. App. 1996).  These courts reason that the franchisor could allow the contractual relationship to continue and bring suit against the franchisee to recover past-due amounts.  In cases where a franchisee has voluntarily abandoned or terminated the franchised business, however, courts have held that the franchisee's decision to close the business caused the loss of future royalties to the franchisor notwithstanding that the franchisor may have subsequently terminated the contract.  See Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC, 423 F. App'x 274, 281-83 & n.8 (4th Cir. Apr. 14, 2011); Lady of Am. Franchise Corp. v. Arcese, No. 05-61306, 2006 U.S. Dist. LEXIS 68415, at *13-*17 (S.D. Fla. May 25, 2006); Burger King Corp. v. Barnes, 1 F. Supp. 2d 1367 (S.D. Fla. 1998).

        Given the facts before us in the record, we find that genuine issues of material fact exist as to causation with respect to plaintiffs' claim for future royalties.

        Plaintiffs request that the court award each of them a contractually-imposed $6,000 termination fee.  Both franchise agreements state that "[i]n the event of termination for any default of [SOTW], [SOTW] shall promptly pay to Franchisor a termination fee in the amount of $6,000 and all damages, costs and expenses, including reasonable attorneys' fees, incurred by

Franchisor as a result of the default."  Defendants argue only
that an award of the termination fee is premature until the court
determines that SOTW breached the franchise agreement.[21]  The
undisputed facts demonstrate that SOTW was in default of its
obligations under the franchise agreement by failing to pay rent
to the landlord as required by the sublease.  Each plaintiff is
entitled to a termination fee of $6,000 under Counts III and IV
of the complaint.  As with the past-due royalties discussed
above, liability for the $12,000 of termination fees will be
imposed jointly and severally on the three defendants.

        Plaintiffs request that the court enforce an interest
provision in the franchise agreements.  The franchise agreements
provide that royalty payments on gross monthly sales were due to
plaintiffs on the 15th day of the following month.  Plaintiffs
were authorized to debit these amounts from SOTW's bank account.
The contracts state:

> If the funds in Franchisee's bank account are
> insufficient to cover any amounts due to
> Franchisor on the date such amounts are due,
> in addition to the overdue amount, Franchisor
> shall immediately be entitled to debit from
> Franchisee's bank account interest on such
> amount from the date it was due until all
> past due amounts are paid, at the rate of the
> lesser of 18% per annum or the maximum rate
> permitted by law.

---

21.  Defendants have not argued that the termination fee, a form
of liquidated damages, is penal in nature and therefore
unenforceable.  See Commonwealth v. Mitchell, 535 A.2d 581, 213-
17 (Pa. 1987); Geisinger Clinic v. Di Cuccio, 606 A.2d 509, 516-
18 (Pa. Super. Ct. 1992).

Defendants do not deny that plaintiffs are entitled to interest on past due royalties in accordance with the franchise agreements.  Plaintiffs have not advised the court of the amount of interest due or how to calculate this amount.  Accordingly, we will not award interest at this time.  Plaintiffs may file with the court a statement of the amount allegedly due and an explanation as to how it is calculated.

Plaintiffs suggest in their brief that this interest provision in the franchise agreements applies to "all payments that become past due under the Franchise Agreements."  This is not correct.  The quoted provision appears in a portion of the contract discussing plaintiffs' entitlement to royalty fees and initial franchise fees.  The contracts do not allow an 18% interest per annum on all amounts of any kind that SOTW owed to plaintiffs.  The defendants are not required to pay 18% interest on past due rent owed under the sublease or the termination fee owed under the franchise agreements.

Plaintiffs request that the court award them reasonable attorney's fees in prosecuting this action in accordance with the terms of the franchise agreement.  Defendants do not contest that plaintiffs may recover reasonable attorney's fees under the franchise agreements but argue correctly that such an award is premature.  Plaintiffs may request attorney's fees in a separate motion to be filed once all claims have been resolved.

-32-

VI.

Tinder Box seeks damages for breach of the security agreement alleged in Count V of the complaint.  As noted above, the security agreement gave Tinder Box a first priority lien on SOTW's property to secure its performance under the Tinder Box franchise agreement.  Tinder Box asserts SOTW held a liquidation sale on October 16, 2009 and sold items in which Tinder Box had a secured interest.

Tinder Box states in its brief that "Defendants failed to respond to Plaintiffs' repeated discovery requests relating to the items sold at the liquidation sale and the proceeds derived therefrom."  Tinder Box thus asks the court to order SOTW to render an accounting as to the items sold during the liquidation sale.

Tinder Box did not present a motion to compel SOTW to produce discovery on this issue during the discovery period.  Tinder Box has not explained what other discovery tools it employed to secure this information.  Plaintiffs questioned Thomas Slaterbeck about the October 16 sale at his deposition but they have not supplied the complete line of questioning in the transcript excerpts.  Lastly, Tinder Box has a computer-generated record of the Lenox store's sales on October 16, 2009.  Tinder Box offers no evidence suggesting that this sales record does not reflect all sales made at the Lenox store on that date.  No accounting will be ordered.

Because genuine issues of material fact exist as to Tinder Box's damages under Count V of the complaint, summary judgment as to the issue of damages will be denied.

VII.

In Count VI of the complaint, plaintiffs allege that defendants engaged in trademark infringement when they operated the Tinder Box and Vino 100 franchises at the Lenox store on October 16, 2009 after plaintiffs terminated the franchise relationship the previous day. <u>See</u> 15 U.S.C. §§ 1114, 1125. Plaintiffs, we note, are seeking damages for only one day of infringement.

In order to prove a claim of trademark infringement under either § 1114(a) or § 1125(a) (sections 32(1) and 43(a) of the Lanham Act, respectively), the mark holder must show that "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services." <u>Freedom Card, Inc. v. JP Morgan Chase & Co.</u>, 432 F.3d 463, 470 (3d Cir. 2005). The defendants acknowledge that Vino 100 and Tinder Box hold valid trademarks and that defendants used those marks in operating the Lenox store on October 16, 2009. The only issue presented in this motion for summary judgment is whether genuine issues of material fact exist regarding the likelihood of customer confusion.

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or

-34-

service it represents is associated with the source of a
different product or service identified by a similar mark." A&H
Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198,
211 (3d Cir. 2000).  Our Court of Appeals has held that when a
former licensee continues to use a mark after the expiration of
the license, "there is a great likelihood of confusion." U.S.
Jaycees v. Phila. Jaycees, 639 F.2d 134, 142 (3d Cir. 1981).  The
Tinder Box and Vino 100 signs hung above the Lenox store on
October 16 just as they had prior to the termination of the
franchise agreements and the included trademark license.  There
can be no serious dispute that a customer walking into the Lenox
store on October 16, 2009 would likely have been confused into
thinking the store remained affiliated with Vino 100 and Tinder
Box.  See Pappan Enters. v. Hardee's Food Sys., 143 F.3d 800,
803-04 (3d Cir. 1998).

      Under 15 U.S.C. § 1117, a trademark holder may recover
damages for infringement of its mark.  That section provides
that, "subject to the principles of equity," the trademark holder
may "recover (1) defendant's profits, (2) any damages sustained
by the plaintiff, and (3) the costs of the action."  The court is
permitted to enter judgment, "according to the circumstances of
the case, for any sum above the amount found as actual damages,
not exceeding three times such amount."  15 U.S.C. § 1117(a).

      As used in § 1117, "damages" means "means an award
based on either actual damages to the plaintiff or actual profits
of the infringer, measurable in dollars and cents." Caesars

World, Inc. v. Venus Lounge, Inc., 520 F.2d 269, 274 (3d Cir. 1975).  Thus, in order to make any award under § 1117, the plaintiff must have experienced monetary harm or the infringer must have reaped monetary gain.  Id.; see also Donsco, Inc. v. Casper Corp., 587 F.2d 602, 607-08 (3d Cir. 1978).

Vino 100 and Tinder Box do not claim to have suffered a direct monetary loss as a result of defendants' trademark infringement on October 16, 2009.  Rather, plaintiffs seek treble damages on the profits defendants reaped from the Lenox store's operation on that day.  When a plaintiff seeks an award based on an infringer's profits, the plaintiff is required only to prove the defendant's sales, and the burden is on the defendant to prove all costs or deductions.  15 U.S.C. § 1117(a).

Plaintiffs have produced uncontradicted evidence that the Lenox store had sales of $4,300.69 on October 16, 2009.  The defendants have not broken down their costs for October 16, 2009 but have come forward with their costs for the year of 2009 as a whole.  In 2009, SOTW had gross sales of $411,872.69, cost of goods sold of $244,320.46, and other expenses totaling $319,420.42.  Thus, SOTW had a net loss of $151,868.19 for the nine and one-half months that it operated in 2009.  This creates a genuine issue of material fact as to whether defendants experienced any profits from their operation of the Lenox store on the one day in issue, October 16, 2009.  This, in turn, creates a genuine issue of fact as to whether plaintiffs have suffered any compensable "damage" within the meaning of § 1117.

-36-

See Caesars World, 520 F.2d at 274; Steak Umm Co., LLC v. Steak
'Em Up, Inc., No. 09-2857, 2011 U.S. Dist. LEXIS 94088, at *30
(E.D. Pa. Aug. 23, 2011).

The undisputed facts establish that defendants engaged
in trademark infringement by operating the Lenox store under the
Vino 100 and Tinder Box trademarks on October 16, 2009.
Plaintiffs are entitled to summary judgment with respect to
defendants' liability on Count VI of the complaint.  Genuine
issues of material fact exist, however, regarding plaintiffs'
damages, if any, for defendants' violation of the Lanham Act.

VIII.

As noted above, two counts of the defendants'
counterclaim remain pending before the court.  Plaintiffs seek
summary judgment in their favor on both counts of the
counterclaim.[22]

Defendants allege in Count I of the counterclaim that
plaintiffs breached their obligation under the franchise
contracts to provide defendants with marketing materials.  Both
franchise agreements provide that "Franchisor shall make
available to Franchisee, from time to time, at Franchisee's
expense, advertising plans and promotional materials, including
newspaper mats, coupons, merchandising materials, sales aids,

---

22.  For ease of reference, we will continue to refer to Vino 100
and Tinder Box as plaintiffs even though they are defendants on
the counterclaim.  Likewise, we will refer to SOTW, Thomas
Slaterbeck, and Jane Slaterbeck as the defendants even though
they are the plaintiffs on the counterclaim.

point-of-purchase materials, special promotions, direct mail
materials, community relations programs, and similar advertising
and promotional materials."

Defendants have introduced no evidence that Tinder Box
breached this provision of the franchise agreement.  The motion
for summary judgment will be granted in favor of Tinder Box on
Count I of the counterclaim.

With regard to Vino 100, defendants admit receiving a
"Marketing Plan and Media Tool kit" from plaintiffs on or about
August 25, 2006.  Thomas Slaterbeck also testified that he
received "Great Idea newsletters," "Gift Pulse newsletters," and
"Best of Vino newsletters."  Plaintiffs submitted the affidavit
of Wayne Best, their president, who affirmed that promotional
materials were made available to defendants, many of which could
be obtained electronically from the Vino 100 website.  Best also
states that defendants "were free to purchase from Vino 100 ... a
variety of marketing and advertising materials, including, among
other things, business cards, stationary [sic], logo gold foil
labels with store address, shopping bags, & gift cards."

In his affidavit, Thomas Slaterbeck does not dispute
that these items were made available to defendants but takes
issue with the sufficiency of these materials.  For example, he
says "Vino 100 also did not offer adequate marketing products and
services as promised in the Vino 100 Franchise Agreement."  He
also declares that the Vino 100 Marketing and Media Tool Kit
offered "no direct marketing strategies" and "was more of a

-38-

tutorial on ways franchisees may want to try and market their
Vino 100 stores."  According to Slaterbeck, the sample business
plan Vino 100 provided "was useless" because it relied upon sales
of private label wines that could not be sold in Georgia.
Slaterbeck maintains that certain emails sent by Vino 100 "did
not contain any viable marketing strategies."  Slaterbeck does
not comment on the content available on the Vino 100 website.[23]

       Defendants' objections to the type and content of the
advertising materials that Vino 100 offered do not create a
genuine issue of material fact as to Vino 100's compliance with
the contract.  Vino 100 obligated itself to provide "advertising
plans and promotional materials" and to do so "from time to
time."  The company made no warranties or representations in the
contract about the content of the plans and materials that would
be offered, nor did Vino 100 warrant that those materials would
address every franchisee's every advertising need.  The
uncontradicted facts show that Vino 100 satisfied its contractual
obligation to provide defendants with advertising and promotional
materials.  Accordingly, the motion for summary judgment will be
granted in favor of Vino 100 on Count I of the counterclaim.

       In Count VII of the counterclaim, defendants assert
that plaintiffs violated the Georgia Fair Business Practices Act
("FBPA"), GA. CODE ANN. § 10-1-390, et seq., by misrepresenting the
costs and earnings involved in owning a Vino 100 franchise.

---

23.  Defendants did not provide the allegedly deficient marketing
materials for the court to review.

Georgia's FBPA prohibits "[u]nfair or deceptive acts or practices
in the conduct of consumer transactions and consumer acts or
practices in trade or commerce."  GA. CODE ANN. § 10-1-393(a).
According to the statute, "'Consumer acts or practices' means
acts or practices intended to encourage consumer transactions."
Id. at § 10-1-392(a)(7).  "Consumer transactions," in turn,
refers to "the sale, purchase, lease, or rental of goods,
services, or property, real or personal, primarily for personal,
family, or household purposes."  Id. at § 10-1-392(a)(10).[24]

In keeping with the consumer-focused definitions of the
FBPA, the Georgia courts have held that only fraudulent or
deceptive business practices directed at the public may be
remedied under the statute.  The Georgia Court of Appeals has
held:

> One may bring a private suit under the FBPA
> only if he is individually injured by the
> breach of a duty owed to the consuming public
> in general.  [The Act] does not encompass
> suits based upon allegedly deceptive or
> unfair acts or practices which occur in an
> essentially private transaction.  Unless it
> can be said that the defendant's actions had
> or has potential harm for the consumer public
> the act or practice cannot be said to have
> "impact" on the consumer marketplace and any
> act or practice which is outside that

---

24.  The statute broadly defines trade and commerce as
"advertising, distribution, sale, lease, or offering for
distribution, sale, or lease of any goods, services, or any
property, tangible or intangible, real, personal, or mixed, or
any other article, commodity, or thing of value wherever situate
and shall include any trade or commerce directly or indirectly
affecting the people of this state."  GA. CODE ANN. § 10-1-
392(a)(28).

> context, no matter how unfair or deceptive,
> is not directly regulated by the FBPA.

Pryor v. CCEC, Inc., 571 S.E.2d 454, 455 (Ga. Ct. App. 2002)
(internal quotations and citations omitted).  In considering
whether an allegedly deceptive practice was within the scope of
the FBPA, the Georgia courts have concluded that "two factors are
determinative:  (a) the medium through which the act or practice
is introduced into the stream of commerce; and (b) the market on
which the act or practice is reasonably intended to impact."
State ex rel. Ryles v. Meredith Chevrolet, Inc., 244 S.E.2d 15,
18 (Ga. Ct. App. 1978), aff'd 249 S.E.2d 87 (Ga. 1978).  Only if
consideration of both factors reveals that the practice or act
complained of was directed at consumers does the court consider
"the fairness or deceptiveness of the act or practice."  Id.

Applying these factors to the case before us, the
undisputed facts demonstrate that Vino 100's allegedly deceptive
acts occurred in the context of a private transaction.  The
alleged misrepresentations occurred in meetings and telephone
calls that involved only Craft, Best, Blumenthal, and one or both
of the Slaterbecks.  The offending statements were not included
in the Vino 100 disclosure documents, and there is no evidence
these statements were otherwise disseminated to the public.

Moreover, Vino 100's efforts to sell a franchise to the
Slaterbecks did not "encourage" a consumer transaction because
the purchase of a franchise business is not an acquisition made
"primarily for personal, family, or household purposes."  GA. CODE

-41-

ANN. §§ 10-1-393(a)(7), (10).  Thomas Slaterbeck represents in his affidavit that his investment in the franchise was "a personal investment."  This conclusory statement does not create a genuine issue of material fact.  The Slaterbecks purchased the established Tinder Box franchise business at the Lenox store and added to it a second franchise business.  With the assistance of attorneys, defendants acquired two businesses in a state hundreds of miles from their home in New Jersey and spent nearly a million dollars in attempting to make the businesses succeed.  This was not a transaction undertaken "primarily for personal, family, or household purposes."  Id. at § 10-1-393(a)(10).

The motion for summary judgment in favor of plaintiffs will be granted on Count VII of the counterclaim.